### Case No. 5,149.

FULLER v. COLBY et al.

[3 Woodb. & M. 1;[1] 9 Law Rep. 397.]

Circuit Court, D. Massachusetts. Oct. Term, 1846.[2]

---

[1] [Reported by Charles L. Woodbury, Esq., and George Minot, Esq.]

[2] [Affirming Case No. 14,830.]

F. W. Sawyer, for libellant.
Bigelow & Clarke, for libellee.

WOODBURY, Circuit Justice. Most of the testimony in this case, as to the disputed points, comes, on the one side from seamen, and on the other from the mates, corroborated by two or three of the seamen. The former witnesses for the libellant give an aspect to the case more as set out in the libel; while the latter, for the libellee, tend strongly to sustain the averments in the answer. In relation to the points most material, the contradictions are not so strong as on some subordinate questions of very little moment in settling the rights of the parties. It must be admitted, from all the proof, that the libellant in the end suffered severely; was shot down, put in irons, and deprived for some time of his liberty. This was done by the respondent, and it is certain that he should be made to atone for it fully, unless showing a justification by the misconduct of the libellant, and the legal authority of the captain, either to punish him to such an extent, or to do the acts he did in the suppression of mutinous behavior by the libellant, and in the preservation of the vessel, crew, and cargo, under the captain's charge. The truth of the case can best be ascertained by examining the facts chronologically, and applying the law to them as we go along, after fixing what they are, as near as may be, amidst the conflicting testimony and circumstances with which the truth is surrounded. It is stated by both classes of witnesses, that the libellant first used language which, however usual in private life between persons in like stations, was, from a seaman to his commander, before the rest of the crew, and at sea, at least disrespectful if not insolent. It was of bad example to others, considering the relations which exist between officers and their men, and which relations demand towards the former a courtesy and obedience that are necessary, if not indispensable to preserve order and safety to both life and property on board.

The next material fact testified to on all sides, and admitted in the answer, is, that the captain returned or punished this language with a blow. Some of the witnesses say two blows; others speak of but one.

The general character given of the captain is not that of harshness or quickness of temper and great severity, but rather the reverse; while that of Fuller, though not bad in the opinion of some of the witnesses, was such that, according to a part of the evidence, he had previously stated he would take no short answers from any of the officers. The voice of the captain on this occasion, is also sworn to have been mild; while that of Fuller was harsh and angry. I am inclined then to the conclusion, on all the evidence, that the blow struck by the captain was a single one, and not severe; nor was it cruel or unusual. He swears it was with the open hand. No one pretends it knocked the libellant over, or left any mark or bruise. It was not then a cruel punishment; and we all know it not to have been an unusual one. The conclusion is, that if not entirely justifiable, it was still not so much beyond what the disrespectful language of the libellant provoked for punishment, and excused, as to justify him in drawing a dangerous weapon, and making, as some of the witnesses testify, two passes with it at the mate when he came forward to secure the libellant, under the commands of his superior. At the time the captain called for the mate, according to some of the evidence, the libellant drew his knife, and said to the captain, "I will be damned if you flog me." And the truth probably is, from all the evidence as to this point, that he drew the knife rather to prevent further punishment anticipated than on account of the blow he had received, or in mere retaliation of it. Neither his life nor limbs were then in danger, and it was his duty to have obeyed the commands of the captain to lay down his weapon, and submit to the discipline of the ship; and if that had then been carried further, and into a severity not justified by the facts and the law, he would be entitled to, and would doubtless have received, ample redress on his return home. Thompson v. Busch [Case No. 13,944]; Thorne v. White [Id. 13,989]; Relf v. The Maria [Id. 11,692]. The acts of congress punish a captain for extreme severity and misconduct, as well as a seaman for disobedience. This court will always be quite as anxious to redress any wrongs inflicted on the less intelligent seaman, as on his more educated officer,—the law demanding a strict adherence to duty from both, proper language no less than proper acts, as the only means of protecting the rights of both, and rendering their situations respectable, and securing the interests and welfare of all concerned in the voyage. See U. S. v. Peterson [Id. 16,037].

So far, then, as this blow, standing alone and independent of the firing, and wounding afterwards, is now set up as a separate ground for recovering damage, it would seem, if technically unjustifiable, to warrant

no damages but nominal ones—no others from it having been proved or pretended to exist. But so slight a blow as a punishment for insolence seems to me not a crime in a captain. In common cases between individuals, it is true that words do never justify blows; but between officers and seamen all blows are proper for disobedience and insolence, which are justifiable by a parent to a child. See cases cited hereafter. It is the peculiar relation between the parties, which changes their rights and powers. A parent may strike a child for disrespectful words, and, on a like principle, may a captain strike a seaman, notwithstanding what is said in Cushman v. Ryan [Case No. 3,515]. It must be done, however, mildly, moderately, judiciously, but still it may be so done, and not going beyond that—for that alone damages ought not to be given, where the seaman who is struck, first forgot his duties and treated his superior with disrespect, and especially as here, where no actual damages were sustained by the blow. In the present instance, by this blow no wound was inflicted—no blood drawn—no weapon used—no flogging given, nor whipping with rope, stick or cane. And though under sudden impulse and disrespectful words, Colby may have struck a slight blow with his hand, which had better have been omitted, and confinement, or some other punishment substituted, yet I could not say that a parent so acting was liable to damages to a child so offending, and the law is the same on these subjects between masters and seamen. It is a little singular, that as long ago as by the laws of Oleron, it was provided, "if any of the mariners impudently contradict the master, he (the seaman) also ought to pay eight deniers, and if the master strike any of the mariners, he (the seaman) ought to bear with the first stroke, be it with the fist or open hand; but if the master strikes him more than one blow he may defend himself." Article 12, 1 Pet. Adm. 26 Append.

The first point made then, is, in my opinion, not sustained so as to show any right to damages for the blow then struck. The libellant, on the contrary, having committed the first offence by disrespect, and, not being punished for it with any severity or cruelty, or damage whatever. He was wrong in the second place, in drawing a dangerous weapon and brandishing it at his officers. Remembering this, we are prepared to proceed to the next ground set up in the libel and argument for recovering damages, in consequence of the subsequent firing of the pistol at the libellant by Colby. In deciding justly on this. it will be proper to examine the history and progress of the transaction after what has been already explained. Without discriminating as to these, with care, the facts existing at different times, and the rights existing under different states of things, and different powers and liabilities of the parties, will be in danger of confusion and of producing erroneous conclusions. It seems, that the master at once gave the mate orders to take Fuller into custody, and the next material evidence relates to the drawing of his knife by Fuller; to the seizure of the belaying pin by the mate; and then of the axe by the libellant; and his threats to use it against any one. including the captain or any officer who should approach to arrest or disarm him, and his refusal to lay the axe down, notwithstanding the repeated orders of the captain, unless the mate would first lay down the capstan bar, which he held in his hands. But the whole testimony shows that the mate had no orders or design to use the capstan bar unless it became necessary to disarm the libellant. His whole object with it was the arrest of Fuller. There was no danger, then, of great bodily injury from the mate or master using the bar, if Fuller had laid down the axe and knife and obeyed orders, whatever confinement or other and further punishment might be anticipated for his original offence. It was, therefore, his duty to lay down his weapons, as commanded; and he was in further wrong to stand out for conditions and terms with his officers before complying. His attitude in resisting them and disobeying them in this way, about which most or all of the witnesses agree in their evidence, was also of evil example on board. It led one of the crew to unite with him in disobedience. It induced another to cheer him on. It caused the man at the wheel to abandon his post—the last post to be left under any peril; and led to great disorder and danger in the whole vessel. Indeed, Fuller seems to have avowed principles as to subordination at different times after coming on board which compel the court, however unwillingly, to put an unfavorable construction on his acts, and often to credit the evidence for the captain when it conflicts with that of Fuller concerning his motives and conduct. Firstly, as testified. Fuller had expressed the determination to take "no short answers" from his officers; next, not to submit to any flogging; and finally, he would use and not lay down deadly weapons, and would disobey all orders to do it, until the officers should make terms with him and previously disarm themselves.

Such insubordinate resolutions naturally led to disorder and mutiny, and at last involved the whole crew in danger as well as the vessel and cargo. It is true, some cases say that the sailor may oppose a further infliction of personal chastisement by escaping and even by resistance, so far as to protect himself against injury. U. S. v. Smith [Case No. 16,345]. But this must mean resistance to protect himself against undeserved and great bodily injury, and not resistance to a moderate chastisement, to which he was legally liable for some offence. Because, if

legally liable to it, a corresponding duty is imposed on him to submit to it, and on the master to inflict it. Any other reasoning or conclusion would be involved in absurdity, and hence courts say other seamen "are bound to assist the master to constrain, imprison, and bring to justice any disobedient, mutinous and rebellious mariners." Relf v. The Maria [supra]. That the master, in the heat of the moment, may have contemplated putting Fuller under arrest, and inflicting some further chastisement, is probable from the evidence. But that this was likely to be severe if Fuller submitted and apologized, unless he provoked more by brandishing the knife and axe at his officers, and refused to obey them by laying the latter down, does not seem probable from the evidence, and did not, in my view, justify him in persisting not to obey till others of the crew thus became insubordinate with him—the helm abandoned and the vessel in danger. If yielding submission, and afterwards punished immoderately, ample redress would have been given to him on his return home. Relf v. The Maria [supra]. But not submitting, in that exigency the master having armed himself, as described in the answer, deemed it his duty to disable the libellant so as to make the arrest, and put down anything like mutiny on ship-board, and restore order and security. Accordingly the captain then fired at him, and thus caused the injuries most complained of. If his firing became necessary to regain his authority, when disregarded and trampled on, and was required in order to restore obedience and to secure the vessel; at that time become adrift, however severe the course, and however painful the consequences, it is not punishable by law. U. S. v. Peterson [supra]. Considerable latitude of judgment must be allowed in such exigencies to him who is responsible for all the lives and property on board.

But at the same time, on such occasions, officers must exercise due clemency and firmness of nerve. The peril must be manifest—the disobedience clear—and the step taken not unusual, not immoderate, and not apparently uncalled for, in order to accomplish a justifiable end with sufficient promptness and certainty. Though in some respects questioned and questionable, the position of the libellee was probably of this last character. So a grand jury of his country have once found, and so the district court has once decided in this prosecution. [Case No. 14,830.] Whatever of impressions to the contrary might, in some particulars, have made me hesitate, independent of these findings, these last weigh something in matters of doubt. They do not and should not induce me to form any conclusion as to facts, which were not sustained by testimony entitled to credit. But decisions below in admiralty are often to be presumed correct till an error or mistake is clearly shown, else litigation would be encouraged. Cushman v. Ryan [supra]. Appellate courts in admiralty do not in general receive facts critically—the presumption being in favor of them as found by the court below. Cox v. Palmer [3 Fed. 16]. Better means of judging by the district court exists than by the circuit court and by the circuit court than by the supreme court. The former often knows the usages and witnesses, and these are at times on the stand. The Apollon, 9 Wheat. [22 U. S.] 378. The conclusions in favor of the respondent are also strengthened by several other circumstances, such as the general considerations growing out of there being no proof of his having any previous hostility or grudge towards the libellant—of the mild and good character of Captain Colby generally—of his attention to Fuller's wounds subsequently, and placing him in a hospital while in port—of his keeping him in irons only while insubordinate—of his going before the American consul, at Havre, and exposing all the facts and courting an investigation—and of his not striking the libellant at all-till disrespectfully treated, and of his not firing with balls instead of shot, nor so near to Fuller as likely to kill him,—nor at all, till every other mode had failed of producing obedience and restoring order, without making what he considered a derogatory compromise with an offender. I think the testimony competent, too, as a part of the res gestae, that Colby said at the time of the transaction, he meant not to fire at F.'s head, but the arm which held the axe, and that this goes far, with the other facts just named, to repel any idea of his intention to kill F., or to wound him so severely as he did.

If this was the first trial of this case, however, I should doubt whether the exigency was so very pressing and dangerous as to have required so strong a measure as using fire-arms without some longer delay, and some further attempts in the mean time to get the ship under her helm, and the rest of the crew on duty. I am also inclined to the conclusion, that, had he left the libellant till that was accomplished, and then returned and remonstrated against his dangerous course, after he had enjoyed time to become cooler, the firing would not have been necessary; nor would this have evinced any want of due firmness, but less of passion. Remembering, however, on such occasions, that in human bosoms passion must exist, more or less, on both sides—that men of different temperaments and habits will act differently in the same cases, and with equal honesty—and that obedience is often necessary to be prompt in order to command at all due respect and influence in captains of vessels (Thorne v. White [supra]), I yield something of my doubts on these matters to the latitude of judgment and differences of opinion incident to such positions—to the obvious fact that one present can judge of the dan-

ger better than the absent—and to the force of the two findings before referred to in his favor. In relation to the subsequent confinement and irons put on the libellant, they were natural and justifiable after the violence and disobedience he had been guilty of—the officers then justly believing him to be a dangerous man. Especially was it justifiable when the libellant, as is proved by some of the witnesses, still evinced an insubordinate disposition; and the irons were then continued on only till obedience was promised and confided in.

Many adjudged cases, which have not yet been cited, seem to lay down principles that fully sustain the views I have expressed as to the law on the facts, according to their aspect to my mind under the contradictions which exist. It may not be amiss to classify and present several of them. Thus, it is well settled that a master of a vessel may punish a seaman for disrespect, disobedience or disorder on board, as far as a parent may a child. U. S. v. Freeman [Case No. 15,162]; Bangs v. Little [Id. 839]; 3 Kent, Comm. 181; Thompson v. Busch [supra]. Other cases say as far as a master may an apprentice (Case of The Agincourt, 1 Hagg. Adm. 271), or a school master, a scholar (14 Johns. 123, by Thompson, J.). To stir up others to disobedience, or to refuse duty on ship-board, by a seaman, is, by express act of congress, made a crime. Act March 3, 1835 [4 Stat. 775]. The master has a right to respectful demeanor, as well as obedience. Thompson v. Busch [supra]; Butler v. McLellan [Case No. 2,242]; U. S. v. Smith [Id. 16,345]. But this right is of no use unless he is justified in reasonably enforcing it, when refused, by punishment inflicted by himself. U. S. v. Freeman [Id. 15,162]; Thorne v. White [Id. 13,989]. He may, therefore, chastise corporally, as well as confine, when treated impertinently or disobeyed. Michaelson v. Denison [Id. 9,523]; Thompson v. Busch [supra]. But he must not punish for mere immorality as a man, if conducting properly as a seaman. Bangs v. Little [Case No. 839]. Nor must he chastise for offenses as a seaman in a manner indecent. Cushman v. Ryan [Case No. 3,515]. All punishment, also, must be inflicted only to a reasonable extent, as well as in a reasonable and decent manner. Abb. Shipp. 176, note; Brown v. Howard, 14 Johns. 123; U. S. v. Freeman [Case No. 15,162]; Turner's Case [Id. 14,248]; Cushman v. Ryan [supra]; Lord Stowell in the case of The Lowther Castle, 1 Hagg. Adm. 384; U. S. v. Wickham [Case No. 16,689]. But when justifiable it may continue, with proper weapons, till submission or obedience is enforced, else the power becomes nugatory, abortive, and fails to produce the very object for which it was conferred. Michaelson v. Denison [supra]. As obedience should be prompt and uncomplaining (The Mentor [Case No. 9,427]), and the master sustained while enforcing obedience (Relf v. Maria [supra]), and as a master often has not physical power to enforce it, he may, if necessary, resort to weapons, and the law will protect him. But he must resort to proper weapons. Thorne v. White [supra]. And some cases limit the use of weapons, and especially deadly ones, to the prevention of mutiny or its suppression, and do not countenance it for merely punishing past offences. U. S. v. Smith [Case No. 16,345], and Hart v. Littlejohn [Id. 6,153]. But such weapons may be used as are necessary to effect the object (Abb. Shipp. 237, note), when it is to obtain obedience, and not to punish for a past offence (Curt. Adm. 89, 90; Jarvis v. The Claiborne [Case No. 7,225]; Roberts v. Dallas [Id. 11,898]). And much more may he do all this when the seaman resorts to violence—deadly weapons—himself; and the crew appear mutinous, and the vessel becomes in danger. U. S. v. Peterson [supra]; 1 Holt, Shipp. 430. If the captain was in such a case, to stop to consult others, or to argue the case long with the offender, or not use weapons when other means failed, the vessel might be lost. Butler v. McLellan [Case No. 2,242]. When punishment is merited, its extent cannot be weighed very nicely in the scale. It must be clearly excessive, or no damages are to be allowed. Thorne v. White [supra], and notes; Butler v. McLellan [supra]. In some cases the captain should take time and consult, when in others it is not safe. It is best to consult when he can, as it is more satisfactory to all parties, and allows reason, rather than passion, to speak and reign. Abb. Shipp. 136, 137; Whiteman v. The Neptune [Case No. 17,569]; Thorne v. White [Id. 13,989]; Jarvis v. The Claiborne [Id. 7,225]; Sampson v. Smith, 15 Mass. 365. See the rule in the marine ordinance of France (section 22). And the more especially was this consultation proper and necessary, in ancient times, when the crew and officers were often joint owners of ship and cargo, and all but nominally equal in education, and standing, and skill.

Here several appeals were made by the captain to Fuller for submission, and the mate was conferred with before firing; and time was again and again given to lay down the axe: and it was not till a crisis of disorder and disobedience, with others of the crew as well as him, and of peril to the vessel had arrived, that Fuller was disabled, and order restored. It will be seen, that the object of Colby, on this occasion, in firing, was not to punish for a past offence, where the instrument used should not be deadly, but was to make an arrest, procure submission and obedience, and defend himself and vessel against mutiny. Deadly weapons, thus used and thus necessary to accomplish a legal end, are not forbidden. They may be the only ones likely to accomplish it. Curt. Adm. 90; 15 Mass. 365; 14 Johns. 119.

Finally, it will be further seen, that though

Fuller retreated, and some ancient ordinances provide that the captain shall not follow a retreating mariner to the prow of the vessel, (Thorne v. White [supra]), yet I am not aware of any such distinction settled by principle or practice in modern times, when a seaman is pursued to arrest him for disobedience, and not in a mere unprovoked affray, and the more especially when, as in this case, the seaman is also pursued to disarm him while in a state of mutiny.

I have thus spoken of the law of this case, as it appears to me to be on the facts, impressing themeselves on my mind as the last do, amidst several contradictions, after much deliberation. What the law ought to be, and could be with safety and more advantage to the mercantile marine, is another question. and one which it does not belong to the judicial tribunals to decide, so as to make it a rule of action. A distrust of the necessity of flogging in the army and navy is certainly increasing elsewhere as well as in this country, and for punishment of crimes in the civil and municipal affairs of society has, by many states, been entirely abandoned in their penal codes. In the merchant service. if not in the navy, it would seem not very difficult or hazardous in the present improved and improving character of seamen in this country, for our legislatures to substitute other punishments for blows of any kind, especially on adults. And, considering this improved condition of morals and education among seamen, and especially American ones, considering also the greater privileges and rights conferred on all American citizens, however humble, and whether seamen or landsmen: considering further, that the authority to inflict personal chastisement in the case of parents or children, and masters or apprentices,—to which this has always been likened,—is to be exercised in most cases over minors only, it may well deserve legislative attention, whether the master of a vessel, except in the case of minors, should be allowed summarily and without any trial, to inflict corporeal punishment at all on his crew, or any beyond a very limited extent, unless it be necessary to repel personal assaults, or suppress a manifest mutiny or riot. For a time, as an experiment in other cases, a resort could be provided and limited to mere confinement—loss of wages, and prosecution in the courts on the return of the vessel. But my official duty requires me to say such is not the law now, and never has been the law in this country, or probably in any other; and it would be a usurped judicial legislation for any court to attempt to introduce it as law without a previous change and direction by another department of the government.

Let the judgment below be affirmed.